**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


**TIMOTHY J. SIMS,**

        **Plaintiff,**

**v.**                                      **No. 1:16-cv-00870**

**FIRST AMERICAN PROPERTY &
CASUALTY INSURANCE COMPANY,
ROBERT DALTON, and MICHAEL
HENDRICKSON,**

        **Defendants.**


**COMPLAINT FOR BREACH OF CONTRACT, VIOLATIONS OF THE UNFAIR
INSURANCE PRACTICES ACT, VIOLATIONS OF THE UNFAIR PRACTICES
ACT, TWISTING, BAD FAITH, FRAUD, NEGLIGENT MISREPRESENTATION,
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND
DECLARATORY JUDGMENT AGAINST DEFENDANTS
FIRST AMERICAN PROPERTY & CASUALTY INSURANCE COMPANY,
ROBERT DALTON, AND MICHAEL HENDRICKSON**

COMES NOW Plaintiff, Timothy J. Sims, by and through his attorneys of record,

O'BRIEN & PADILLA, by Daniel J. O'Brien and Erica R. Neff, and in support of his Complaint

for Breach of Contract, Violations of the Unfair Insurance Practices Act, Violations of the Unfair

Practices Act, Twisting, Bad Faith, Fraud, Negligent Misrepresentation, Intentional Infliction of

Emotional Distress, and Declaratory Judgment against Defendants First American Property &

Casualty Insurance Company, Robert Dalton, and Michael Hendrickson ("Complaint") states as

follows:

## I.     IDENTIFICATION OF PARTIES

    1.     Plaintiff, Timothy J. Sims, is a citizen of the State of New Mexico.

2.      Upon information and belief, at all material times, Defendant First American Property & Casualty Insurance Company ("First American") was incorporated under the laws of the State of California and has its principal place of business in the State of California.

3.      Upon information and belief, at all material times, Defendant Robert Dalton was a citizen of the State of California.

4.      Upon information and belief, at all material times, Defendant Michael Hendrickson was a citizen of the State of California.

## II.      JURISDICTION

5.      The district courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.  28 U.S.C.A. § 1332(a).

6.      Plaintiff Timothy J. Sims is a citizen of the State of New Mexico.

7.      Upon information and belief, at all material times, Defendants First American, Dalton, and Hendrickson were citizens of the State of California.

8.      The amount in controversy exceeds $75,000, as further established below.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.S. Section 1332, because this is a civil action, there is complete diversity of citizenship of the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

## III.      VENUE

10.      A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.  28 U.S.C.A. § 1391(b)(2).

2

11.     A substantial part of the events and/or omissions giving rise to this claim occurred in the State of New Mexico, and a substantial part of property that is the subject of this action is situated in the State of New Mexico.  Mr. Sims' claims arise out of the events and/or omissions that occurred in relation to insurance claims regarding his property located at 6277 Viramontes Road NW, Albuquerque, New Mexico, 87114, as further described below.

12.     This Court is the proper venue for this claim, pursuant to 28 U.S.C.A Section 1391(b)(2).

## IV.     FACTS

13.     At all material times, Mr. Sims owned the property located at 6277 Viramontes Road NW, Albuquerque, New Mexico, 87114 (the "Home").

14.     Mr. Sims purchased the Home in 2011 with the intention of living there with his wife and young children.

15.     At the time of purchase, the Home was brand new and included customizations and upgrades chosen by Mr. Sims to accommodate the needs and preferences of himself, his wife, and his children.

16.     Mr. Sims and his family moved in to the Home soon after closing on the purchase in 2011.

17.     The Home served as the primary residence of Mr. Sims, his wife, and his children.

18.     Mr. Sims purchased a significant amount of new contents for the Home immediately before and/or after moving in, including furniture, appliances, clothing, and other personal property.

19.     In the early morning hours of December 12, 2014, Mr. Sims suffered a devastating loss when the Home, its contents, and other property owned by Mr. Sims were destroyed in a fire (hereinafter "the fire").

20.     Upon information and belief, the fire started in or near the fireplace of the Home and quickly spread, ultimately tearing through both stories of the Home and through the Home's roof.

21.     The Albuquerque Fire Department's reports describe some of the devastating damages, particularly to the roof of the Home, as follows:

> "FIRE HAD SPREAD TO THE ENCLOSED FLU SECTION AND FROM THERE TO THE ATTIC AND CANTELEVER SECTION ACROSS THE BACK OF THE BUILDING… E21 advised they had a two story with fire and heavy smoke from the second story. . . Reports of heavy smoke and fire from four sides of the roof, with a break through of fire, combined with reports of a floor collapse prompted an evacuation of the structure. . . Ceiling was pulled on the first and second floor eventually. . . Assessment of Damage: The structure suffered extensive water/smoke/fire damage and will not be inhabitable."

(Emphasis in original.)

22.     Neither Mr. Sims nor anyone else in his family caused or contributed to the fire's ignition.

23.     Although Mr. Sims' wife and three (3) young children were in the Home when the fire started, they were lucky to have escaped without known serious physical injury from the fire.

24.     The fire caused severe, and in some areas irreparable, damage to the Home's structure, rooms, contents, yard, and nearby structures.

25.     At all material times, the Home and its contents were insured by Defendant First American, pursuant to the policy and endorsements attached hereto as Exhibit A (hereinafter the "Policy").

26.     Mr. Sims paid premiums to Defendant First American in exchange for the Policy.

27.     The Policy was a renewal of a previous policy, meaning that Mr. Sims had not only paid premiums to Defendant First American for this Policy, but also for past coverage.

28.     The Policy created a contractual relationship between Mr. Sims and Defendant First American.

29.     Mr. Sims paid additional consideration for endorsements to the standard form of Defendant First American's insurance policy, as shown in Exhibit A.  *Id*. at First American 002016.

30.     One such endorsement was the "Eagle Premier Coverage," for which Mr. Sims paid additional premiums.  *See, e.g.,* Ex. A, First American 002016 and 002056-002057.

31.     Defendant First American advertises its "additional coverage" under the "Eagle Premier Coverage" Endorsement on its website, in pertinent part, as follows:

> "Eagle Premier: With additional coverage in Eagle Premier, you get:
> - 150% Replacement cost coverage on your dwelling in the event of a total loss
> - 20% More personal property coverage
> - 100% Replacement coverage on personal property
> - Additional coverage and limits are increased on nine types of valuable property [and]
> - 10% more coverage to bring your home up to code in the event of a total loss."

*See, e.g.,* Defendant First American Website, https://www.fapcig.com/products/homeowners/.

32.     Mr. Sims was induced to pay and did in fact pay such additional consideration for the "Eagle Premier Coverage" Endorsement under the promise of additional benefits, increased coverage, immediate replacement cost of personal property without deduction for depreciation, the full cost of repair of personal property at the time of loss, and other "premier" benefits that he reasonably believed would be available to him in the event of a loss.

33.     Even before consideration of the increased coverages available under the "Eagle Premier Coverage" Endorsement, Mr. Sims' Policy provided over $1,000,000 in available coverage in the event of a compensable loss, such as a fire causing damage to the Home and its contents.

34.     Upon information and belief, at all material times, Defendant Dalton was an employee of Defendant First American whose relevant conduct may or may not have been within the scope of his employment.

35.     Defendant Dalton actively participated in the claims handling and claims decision-making processes regarding Mr. Sims' fire-related claims.

36.     Upon information and belief, at all material times, Defendant Dalton was the Vice President of Claims and therefore had supervisory, managerial, or similar authority to make decisions on behalf of and as a representative of Defendant First American.

37.     Upon information and belief, at all material times, Defendant Hendrickson was an employee of Defendant First American whose relevant conduct may or may not have been within the scope of his employment.

38.     Defendant Hendrickson actively participated in the claims handling and claims decision-making processes regarding Mr. Sims' fire-related claims.

39.     Upon information and belief, at all material times, Defendant Hendrickson was a claims representative assigned to handle Mr. Sims' claims in relation to the fire, and was authorized to act on behalf of Defendant First American in doing so.

40.     As employees and agents of Defendant First American, Defendants Dalton and Hendrickson owed Mr. Sims a duty to comply with the same standards, rules, regulations, and Policy provisions as Defendant First American.

41.     Defendants First American, Dalton, and Hendrickson owed Mr. Sims all duties outlined in the Policy.

42.     Defendant First American issued the Policy to Mr. Sims in New Mexico.

43.     Defendants First American, Dalton, and Hendrickson owed Mr. Sims all duties required of insurers toward their insureds under New Mexico law.

44.     Defendants First American, Dalton, and Hendrickson have never asserted that either Mr. Sims or anyone else in his family caused or contributed to the fire's ignition.

45.     Defendant First American accepted Mr. Sims' claims in relation to the fire as compensable under the Policy.

46.     The Policy's applicable limits are not exhausted under any of the coverages therein.

47.     Defendants First American, Dalton, and Hendrickson have never asserted that the Policy's limits under any coverage are exhausted.

48.     To the extent they existed and/or are later deemed enforceable by the Court or other finder of fact, Mr. Sims complied with all duties and conditions precedent required under the Policy.

49.     Defendants First American, Dalton, and Hendrickson have never asserted that Mr. Sims failed to comply with the terms or duties of the Policy or failed to otherwise satisfy any enforceable conditions precedent in the Policy.

50.     Defendants First American, Dalton, and Hendrickson breached the duties owed to Mr. Sims under the Policy and under the laws of the State of New Mexico, resulting in damages to Mr. Sims in excess of $75,000, exclusive of interest and costs.

51.     Defendants First American, Dalton, and Hendrickson have failed and refused to properly inspect or pay for Mr. Sims' dwelling damages, including specifically, but not limited to, his roof damages and driveway damages.

52.     The fire caused such extensive damage to the Home that it should have been entirely demolished and rebuilt, and the entire demolition and rebuild processes should have been paid under Mr. Sims' Policy.

53.     Instead, Defendants First American, Dalton, and Hendrickson made concerted efforts to underpay and/or deny Mr. Sims' claims, delay the claims process in an attempt to discourage Mr. Sims from pursuing his rightful claims, and underestimate Mr. Sims' damages in an attempt to withhold contractually owed Policy proceeds from Mr. Sims and instead increase their own corporate and personal profits.

54.     In failing to pay to demolish and rebuild the Home, Defendants First American, Dalton, and Hendrickson breached the Policy.

55.     In putting their own interests ahead of the insured, Mr. Sims' interests, Defendants First American, Dalton, and Hendrickson breached the Policy.

56.     The Home's roof was so damaged by the fire that it required complete replacement.

57.     The contractor for the Home's repairs immediately informed Defendant First American that it recommended replacement of 100% of the roof decking material.

58.     Jewel Construction has provided an estimate of the cost to properly replace the Home's roof that amounts to $98,042.

59.     Moving Solutions, Inc., has provided an estimate of the costs to pack out, store, and pack in personal property from the Home during the roof replacement process that amounts to $2,435.30.

60.     Additional living expenses will be incurred as damages to Mr. Sims during the roof replacement process, due to Mr. Sims and his family having to temporarily move to alternative living accommodations during the construction work.

61.     Jewel Construction's estimate, Moving Solutions, Inc.'s estimate, and an estimate of additional living expenses during the roof replacement process were provided to Defendants First American, Dalton, and Hendrickson along with a request that payments be made under the Policy for those costs.

62.     Mr. Sims has repeatedly requested that Defendant First American pay, pursuant to the Policy, for his roof be replaced and for the related pack out, storage, pack in, and additional living expenses, in order to bring the Home back to its pre-loss condition.

63.     Defendants First American, Dalton, and Hendrickson have denied the roof replacement requests and have failed to respond to Mr. Sims' requests for the related pack out,

storage, pack in, and additional living expenses, thereby breaching the Policy and causing damages to Mr. Sims well in excess of $100,000 in relation to his roof claim alone.

64.     As a result of Defendant First American's denial of the roof replacement request and recommendation, the Home's roof presents a danger to Mr. Sims and his family and the residual elements left on the roof's materials cause the Home to smell like smoke.

65.     The smoke smell in the Home is a reminder of the traumatic and tragic fire that tore through the Home and threatened Mr. Sims' family's lives.

66.     The Home's driveway, which was only about three (3) years old and undamaged at the time of the fire, was cracked, sunken, scratched, and discolored as a result of the fire.

67.     Mr. Sims and the contractor for the Home's repairs have repeatedly informed Defendants First American, Dalton, and Hendrickson that the Home's driveway repairs should be paid under the Policy and have provided an estimate for said repairs.

68.     Defendants First American, Dalton, and Hendrickson have acknowledged that the Home's garage floor, which is directly adjacent to the driveway, was damaged in the fire and accordingly paid for garage floor repairs more than one (1) year ago.

69.     Nevertheless, Defendants First American, Dalton, and Hendrickson have denied payment for the driveway repairs in breach of the Policy, resulting in damages to Mr. Sims.

70.     The personal property in the Home was damaged and/or destroyed in the fire.

71.     Defendants First American, Dalton, and Hendrickson have acknowledged that the personal property damages are covered under the Policy, yet have failed and refused to pay what is owed under the Policy, thereby breaching the Policy and causing damages to Mr. Sims.

72.     Defendants First American, Dalton, and Hendrickson have not only ignored Mr. Sims' documentation and information that was provided repeatedly throughout the claims process, but have also applied blatantly incorrect values to Mr. Sims' damaged personal property, withheld recoverable replacement costs, and refused to pay for damaged personal property altogether in some cases.

73.     Mr. Sims was entitled to immediate payment from Defendant First American for full replacement cost of all damaged personal property.

74.     Mr. Sims paid additional premiums for such coverage by purchasing the "Eagle Premier Coverage" Endorsement offered by Defendant First American.

75.     Defendants First American, Dalton, and Hendrickson have repeatedly, knowingly, maliciously, and intentionally breached the Policy by failing to immediately pay full replacement cost of all personal property damaged in the fire.

76.     Additionally, and in the alternative, even if Mr. Sims were owed only actual cash value at the time of loss and recoverable depreciation after replacement of the damaged personal property, Defendants First American, Dalton, and Hendrickson have breached the Policy by failing to pay the actual cash value of such damaged property, severely undervaluing (and in some cases refusing payment altogether for) Mr. Sims' personal property, and further failing to pay the recoverable depreciation even after replacement and proof of such replacement being provided to them.

77.     At the present time, Mr. Sims is owed in excess of $100,000 in personal property coverage under the Policy.

78.     As a result of Defendants First American, Dalton, and Hendrickson's breach of the Policy by failing to pay what is owed for the personal property damages, Mr. Sims has been unable to fully replace the damaged and/or destroyed property, causing further ongoing damage and future damages.

79.     Defendants First American, Dalton, and Hendrickson have applied certain limits and "allowances" not found anywhere in the terms of the Policy in a scheme to limit Mr. Sims' Policy benefit recovery for his personal property loss, in breach of the Policy's terms.

80.     Defendants First American, Dalton, and Hendrickson's improper applications of limits and allowances caused damages to Mr. Sims and will continue to cause damages into the future.

81.     Defendants First American, Dalton, and Hendrickson have repeatedly attempted to apply costs and expenses that it is responsible for against Mr. Sims' Policy limits, in breach of the Policy's terms.

82.     Defendants First American, Dalton, and Hendrickson improper applications of costs and expenses against Mr. Sims' limits caused damages to Mr. Sims and will continue to cause damages into the future.

83.     Defendants First American, Dalton, and Hendrickson have repeatedly attempted to apply costs and expenses against Mr. Sims' Policy limits for actions or services that Mr. Sims received no benefit from, such as costs for "cleaning" personal property that should not have been submitted for cleaning in the first instance and that was ultimately not cleaned, in breach of the Policy's terms.

84.    Defendants First American, Dalton, and Hendrickson improper attempts to apply costs and expenses actions or services that Mr. Sims received no benefit from artificially decreased Mr. Sims' available policy limits, caused damages to Mr. Sims, and will continue to cause damages into the future.

85.    Defendants First American, Dalton, and Hendrickson have repeatedly, unreasonably, and excessively demanded documentation from Mr. Sims in relation to his claims, even where there is no question as to the coverage or amount of the damages at issue.

86.    Even after Mr. Sims produced hundreds of pages of documentation in support of his claims, Defendants First American, Dalton, and Hendrickson demanded further documentation and required the documentation to be produce under arbitrarily imposed deadlines.

87.    Even after Mr. Sims produced hundreds of pages of documentation in support of his claims, Defendants First American, Dalton, and Hendrickson required Mr. Sims to complete extensive inventories of his known damaged personal property, and Mr. Sims complied with their demand for the same to the best of his ability at the time.  The resulting inventories were dozens of pages long.

88.    After requiring Mr. Sims to complete his inventories of personal property, Defendants First American, Dalton, and Hendrickson arbitrarily completed an "adjusted" inventory with unreasonably low pricing, limitations and allowances not found in the Policy terms, and in some instances values of $0 for certain items.

89.    Defendants First American, Dalton, and Hendrickson then demanded that Mr. Sims sign and return his inventory forms in order to be paid for personal property damages.  Mr.

Sims complied with this demand, having been led by Defendants First American, Dalton, and Hendrickson to believe that he was affirming his own inventories and that he would be paid a preliminary personal property damage amount in relation to his inventories.

90.     Thereafter, Defendants First American, Dalton, and Hendrickson falsely asserted that Mr. Sims' signature somehow ratified Defendants First American, Dalton, and Hendrickson's own assertions and "adjusted" inventory, rather than Mr. Sims' own inventories, and further falsely asserted that Mr. Sims was bound by Defendants First American, Dalton, and Hendrickson's false, inaccurate, and undervalued "adjusted" inventory simply by the act of Mr. Sims signing his inventories.

91.     There is absolutely nothing in the inventory document signed by Mr. Sims to suggest that Mr. Sims agreed to Defendants First American, Dalton, and Hendrickson's low-ball, arbitrary, "adjusted" inventory amounts when he signed the document.

92.     Neither Defendants First American, nor Defendant Dalton, nor Defendant Hendrickson explained in any manner, prior to Mr. Sims signing his inventory, that their intention was to try to bind him to their own false, low-ball "adjusted" inventory.

93.     Defendants First American, Dalton, and Hendrickson's actions and positions with respect to the inventory documents are not only in bad faith, but also in direct contradiction with the Policy's terms.

94.     Mr. Sims raised his concerns about Defendants First American, Dalton, and Hendrickson's sudden position regarding Mr. Sims being bound by the "adjusted" inventory figures in a call with Defendant Hendrickson.  This call was witnessed by several others.  During the call, Defendant Hendrickson represented to Mr. Sims and the witnesses that he would re-

evaluate Defendants First American, Dalton, and Hendrickson's position regarding Mr. Sims being bound by the "adjusted" inventory and would evaluate several specific concerns Mr. Sims had regarding the pricing of certain items in the inventory.

95.     Thereafter, Defendant Hendrickson refused to stand by his verbal statements and, in an about-face, instead informed Mr. Sims that Defendants First American, Dalton, and Hendrickson's would ultimately be standing on their position that Mr. Sims was bound by Defendants First American, Dalton, and Hendrickson's low-ball "adjusted" inventory.

96.     In spite of having breached the Policy themselves, Defendants First American, Dalton, and Hendrickson continue to make demands on Mr. Sims under the guise of the Policy terms in lieu of responding to Mr. Sims' payment requests and in lieu of paying the benefits owed under the Policy.

97.     Defendants First American, Dalton, and Hendrickson's ongoing demands include demands for further documentation, demands for entirely irrelevant documentation, demands for duplicative documentation, and demands for Mr. Sims to submit to an examination under oath.

98.     Defendants First American, Dalton, and Hendrickson's ongoing demands are clearly intended to intimidate Mr. Sims and discourage him from pursuing his claims any further, as there is no legitimate purpose behind their ongoing demands at this point.

99.     Defendants First American and Hendrickson repeatedly misrepresented the terms of the Policy with respect to the time limit for Mr. Sims to bring suit against Defendants First American, Dalton, and Hendrickson.

100.     Defendants First American and Hendrickson's misrepresentations as to the time limit for suit were known by them to be false and were made with reckless disregard at the time

they were made to Mr. Sims, were made to Mr. Sims with the intention of misleading and deceiving Mr. Sims, and were made with the intention that Mr. Sims rely on the misrepresentations so as to not file a timely lawsuit (*i.e.*, the misrepresentations were made with the intention of leading Mr. Sims to believe that he could no longer file suit after one (1) year, when in fact the Policy provides a two (2) year period).

101.    Defendants First American, Dalton, and Hendrickson improperly denied additional living expense benefits in breach of the Policy, misrepresented Policy provisions regarding additional living expense coverage, improperly and unreasonably delayed additional living expense benefits, and made statements in writing that directly contradicted their verbal statements to Mr. Sims.

102.    Defendants First American, Dalton, and Hendrickson failed to make timely payments of benefits owed under the Policy and, thereafter, failed and refused to pay the interest owed under New Mexico law.

103.    Mr. Sims specifically requested statutory interest payments from Defendant First American via communications to Defendant Hendrickson; however, rather than pay such interest, Defendant Hendrickson falsely asserted that Mr. Sims had not submitted the statutorily required proof of loss and then denied, on behalf of himself and Defendant First American, the statutory interest required by New Mexico law.

104.    Defendant Hendrickson's misrepresentations and reckless representations to Mr. Sims were made with the intention of deceiving Mr. Sims and to induce Mr. Sims into waiving his right to statutory interest, and Mr. Sims was so induced, as he did not thereafter pursue the statutory interest as he otherwise would have in the absence of Defendant Hendrickson's

misrepresentations and reckless representations.   Mr. Sims suffered damages as a result of Defendant Hendrickson's misrepresentations and reckless representations.

105.    Defendants First American, Dalton, and Hendrickson have made material misrepresentations to Mr. Sims regarding the Policy benefits, claims activity, and other material aspects of the claims process.

106.    Defendants First American, Dalton, and Hendrickson have repeatedly misrepresented the Policy's terms, benefits, requirements, and duties to Mr. Sims.

107.    Defendants First American, Dalton, and Hendrickson have repeatedly and intentionally failed to respond to Mr. Sims' requests for claim documents, claim information, and payments.   Instead, Defendants First American, Dalton, and Hendrickson have repeatedly promised that they would provide such information and subsequently failed to do so in a timely manner, if at all.

108.    Defendants First American, Dalton, and Hendrickson have repeatedly and intentionally failed to promptly provide Mr. Sims with reasonable explanations of the basis relied on in the Policy in relation to the facts or applicable law for denial of his claims or for the offer of a compromise settlement.   Instead, Defendants First American, Dalton, and Hendrickson have repeatedly promised that they would provide such information and subsequently failed to do so.

109.    In spite of there being no dispute about the compensability of Mr. Sims' fire-related claims, Defendants First American, Dalton, and Hendrickson have repeatedly, continuously, unreasonably, and maliciously delayed the investigation of Mr. Sims' claims, delayed the processing and handling of Mr. Sims' claims, delayed payments for known benefits owed to Mr. Sims as a result of his claims, denied benefits owed under the Policy as a result of

Mr. Sims' claims, failed to respond to Mr. Sims' reasonable requests for explanations of Defendants' positions and/or unreasonably delayed providing such responses, and generally treated Mr. Sims with such disregard and in such bad faith as to entitle Mr. Sims to relief on multiple grounds, including, but not limited to, breach of contract, violations of laws applicable to insurers conducting business in New Mexico, twisting, bad faith, fraud, negligent misrepresentation, intentional infliction of emotional distress, and other violations of Mr. Sims' legal rights, as further described herein.

## COUNT I. BREACH OF CONTRACT

110.    All of the foregoing paragraphs are fully incorporated herein.

111.    The Policy created a contract between Defendant First American and Mr. Sims.

112.    As employees and agents of Defendant First American, Defendants Dalton and Hendrickson were also required to comply with the terms of the Policy.

113.    Defendants First American, Dalton, and Hendrickson knowingly and intentionally breached the contractual Policy in failing to pay Mr. Sims the benefits owed under the Policy and as further described herein.

114.    Defendants First American, Dalton, and Hendrickson's breaches of the Policy caused Mr. Sims to suffer damages, and will continue to cause Mr. Sims to suffer damages into the future, as further described herein.

115.    Mr. Sims is entitled to damages as a result of Defendants First American, Dalton, and Hendrickson's many breaches of the Policy.

116.    Defendants First American, Dalton, and Hendrickson are liable for all damages caused as a result of their breaches of the Policy in an amount to be determined at trial.

117.    Defendants First American, Dalton, and Hendrickson acted in a willful, wanton, fraudulent, and malicious manner in breaching the Policy, thereby entitling Mr. Sims to punitive damages to punish Defendants First American, Dalton, and Hendrickson and to deter others from similar malicious and heedless conduct.

118.    Defendants First American, Dalton, and Hendrickson acted unreasonably in failing to pay Mr. Sims' claims.

119.    Mr. Sims is entitled to recover attorneys' fees, costs, and pre- and post-judgment interest.  *See, e.g.*, NMSA 1978, §§ 39-2-1, 57-12-10, 59A-16-30.

## COUNT II. VIOLATIONS OF THE UNFAIR INSURANCE PRACTICES ACT

120.    All of the forgoing paragraphs are fully incorporated herein.

121.    New Mexico's Unfair Insurance Practices Act ("UIPA") forbids any insurance company from engaging in practices that are unfair, deceptive, misleading, or fraudulent.  *See, e.g.*, NMSA 1978, § 59A-16-3; *Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 994 (10th Cir. 1999).

122.    For example, the UIPA prohibits insurers and other persons from making, publishing, issuing, or circulating any estimate, illustration, circular, statement, sales presentation, or comparison which:

  a.   misrepresents the benefits, advantages, conditions or terms of any policy;

  b.   misrepresents the premium overcharge commonly called dividends or share of the surplus to be received on any policy;

  c.   makes any false or misleading statement as to dividends or share of surplus previously paid on any policy;

     d.   is misleading or a misrepresentation as to the financial condition of any person, or as to the reserve system upon which any life insurer operates;

     e.   uses any name or title of any policy or class of policies misrepresenting the true nature thereof;

     f.   misrepresents any policy as being shares of stock; or

     g.   fails to disclose material facts reasonably necessary to prevent other statements made from being misleading.

*See, e.g.,* NMSA 1978, §§ 59A-16-4.

123.    The UIPA further prohibits insurers and other persons from making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, any advertisement, announcement or statement containing any assertion, representation or statement with respect to any business subject to the superintendent's supervision under the Insurance Code, or with respect to any person in the conduct of such business, which is untrue, deceptive or misleading.  NMSA 1978, § 59A-16-5.

124.    The UIPA further prohibits insurers and other persons from knowingly committing or performing any the following practices with respect to claims with such frequency as to indicate a general business practice:

     a.   misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;

b.  failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;

c.  failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies;

d.  failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

e.  not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear;

f.  compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered;

g.  attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

h.  attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his representative, agent or broker;

i.  failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made;

j.  delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

k.  failing to settle an insured's claims promptly where liability has become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage; and

l.  failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

NMSA 1978, § 59A-16-20.

125.   The UIPA further requires an insurer to be held liable for unpaid interest at the rate of one and one-half times the prime lending rate as determined by the New Mexico Superintendent of Insurance, if that insurer fails to pay, within forty-five (45) days after the required proof of loss has been furnished, the amount justly due to the insured.  NMSA 1978, § 59A-16-21.

126.   The UIPA further prohibits insurers from willfully collecting any sum as premium or charge for insurance or other coverage, which insurance or coverage is not then provided or in due course to be provided by a policy issued by an insurer as authorized by the Insurance Code. NMSA 1978, § 59A-16-24.

127.    Defendants First American, Dalton, and Hendrickson have engaged in each and every one of the prohibited acts identified above, as further described herein, causing damages to Mr. Sims in an amount to be determined at trial.

128.    The Department of Insurance of the State of California has issued at least one (1) report regarding Defendant First American.  *See, e.g.*, Lo Report filed 12/22/11, available at http://www.insurance.ca.gov/0250-insurers/0300-insurers/0400-reports-examination/upload/First AmerProp-CasInsCo10.pdf (hereinafter "Lo Report").

129.    The Lo Report addresses Defendant First American's account and record-keeping procedures and "recommended that [Defendant First American] establish and implement procedures and quality control tests to ensure that all information contained in its detail claims listing are accurate."  *Id.* at pp. 7, 13.

130.    The Lo Report notes that "during the examination [Defendant First American] did not properly report some of the support schedules and account balances in accordance with the National Association of Insurance Commissioners' (NAIC) Annual Statement Instructions."  *Id.* at pp. 7-8, 13.  The Lo Report goes on to recommend that Defendant First American "implement controls to identify potential errors and properly review its statutory financial statements for compliance with NAIC Annual Statements Instructions before they are submitted to the California Department of Insurance."  *Id.*

131.    The Lo Report finds that Defendant First American "did not property report its preferred stocks with National Association of Insurance Commissioners' (NAIC) designations 3 to 6," and recommended that Defendant First American comply with "SSAP 32, paragraph 19." *Id.* at pp. 12, 13.

132.     The Lo Report makes recommendations for Defendant First American to properly file its agency agreement with the California Department of Insurance for approval. *Id.* at pp. 5, 13. This was a repeat recommendation, as Defendant First American had apparently not complied with this recommendation after the prior examination report was issued in or around 2007. *Id.*

133.     The Lo Report makes recommendations for Defendant First American to properly file its tax allocation agreement with the California Department of Insurance for approval. *Id.* at pp. 5-6, 13. This was a repeat recommendation, as Defendant First American had apparently not complied with this recommendation after the prior examination report was issued in or around 2007. *Id.*

134.     The Lo Report makes other recommendations for Defendant First American in order to correct its improper accounting procedures and tax practices. *See, e.g., id.* at pp. 12-13.

135.     The Lo Report, as well as Defendant First American's actions and omissions with respect to Mr. Sims' claims described herein, establish the unfair, deceptive, and illegal patterns and practices of Defendant First American not only in Mr. Sims' case, but as a company in general.

136.     The Lo Report, as well as Defendant First American's actions and omissions with respect to Mr. Sims' claims described herein, establish Defendant First American's primary concern: profits for the corporation, regardless of the harm to its insureds or the illegal activities required to achieve those profits for the corporation.

137.     Defendants First American, Dalton, and Hendrickson willfully engaged in unfair and deceptive trade practices, thereby entitling Mr. Sims to treble damages and/or punitive damages.

138.     Defendants First American, Dalton, and Hendrickson acted unreasonably in failing to pay Mr. Sims' claims.

139.     Mr. Sims is entitled to recover attorneys' fees, costs, and pre- and post-judgment interest.  *See, e.g.*, NMSA 1978, §§ 39-2-1, 57-12-10, 59A-16-30.

## COUNT III. VIOLATIONS OF THE UNFAIR PRACTICES ACT

140.     All of the forgoing paragraphs are fully incorporated herein.

141.     New Mexico's Unfair Practices Act ("UPA") prohibits misleading, deceptive, and unconscionable communications and practices.  *See* NMSA 1978, §§ 57-12-1 *et seq*.

142.     Under the UPA, an unfair or deceptive practice includes any false or misleading oral or written statement, visual description, or other representation of any kind made in connection with the sale of goods or services that may, tends to, or does deceive or mislead any person.  *See* NMSA 1978, § 57-12-2.

143.     The following are examples of expressly prohibited practices under the UPA, all of which Defendants First American, Dalton, and Hendrickson have engaged in with respect to Mr. Sims' Policy and/or claim:

     a.  Causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

     b.  Representing that goods or services have characteristics, uses, benefits, or quantities that they do not have;

c.   Representing that goods or services are of a particular standard, quality, or grade if they are of another;

d.   Making false or misleading statements of fact concerning the price of goods or services;

e.   Using exaggeration, innuendo, or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

f.   Stating that a transaction involves rights, remedies or obligations that it does not involve;

g.   Stating that services, replacements or repairs are needed if they are not needed; and

h.   Failing to deliver the quality or quantity of goods or services contracted for.

144.   Defendants First American, Dalton, and Hendrickson willfully engaged in unfair, deceptive, and unconscionable trade practices that are prohibited by law, including the UPA, thereby entitling Mr. Sims to actual and/or statutory damages, treble damages, and punitive damages. *See, e.g.*, NMSA 1978, § 57-12-10.

145.   Defendants First American, Dalton, and Hendrickson acted, at various times, jointly and/or separately, in violating the UPA.

146.   Defendants First American, Dalton, and Hendrickson are jointly and severally liable for Mr. Sims' damages.

147.   Defendants First American, Dalton, and Hendrickson acted unreasonably in failing to pay Mr. Sims' claims.

148.    Mr. Sims is entitled to recover attorneys' fees, costs, and pre- and post-judgment interest.  *See, e.g.*, NMSA 1978, §§ 39-2-1, 57-12-10, 59A-16-30.

## COUNT IV. TWISTING

149.    All of the foregoing paragraphs are fully incorporated herein.

150.    Under the New Mexico Insurance Code, insurers may not make or issue, or cause to be made or issued in any manner, any written or oral statement misrepresenting or making misleading comparison as to the terms, conditions, benefits, or advantages of any policy for the purpose of inducing or attempting or tending to induce any other person to retain or otherwise deal with any policy.  *See* NMSA 1978, § 59A-16-6.  Such a practice is "twisting" and is prohibited by law.  *Id.*

151.    In addition to the above allegations, and/or in the alternative, Defendants First American, Dalton, and Hendrickson's advertisements and representations regarding Defendant First American's Policy coverages, including its "Eagle Premier Coverage" endorsement, are intended to and/or made for the purpose of inducing others, such as Mr. Sims, to purchase Defendant First American's homeowners policies and endorsements.

152.    In addition to the above allegations, and/or in the alternative, Defendants First American, Dalton, and Hendrickson's advertisements and representations are untrue, misleading, and misrepresent the Policy terms, conditions, benefits, and advantages.

153.    Defendants First American, Dalton, and Hendrickson have engaged in twisting in Mr. Sims' case both in the course of selling him the Policy and in the course of his fire-related claims.

154.    Mr. Sims is entitled to damages in an amount to be determined at trial for Defendants First American, Dalton, and Hendrickson's violations of the anti-twisting statute, which is an unfair and deceptive trade practice.

155.    Defendants First American, Dalton, and Hendrickson willfully engaged in unfair and deceptive trade practices, thereby entitling Mr. Sims to treble damages and/or punitive damages.

156.    Defendants First American, Dalton, and Hendrickson acted unreasonably in failing to pay Mr. Sims' claims.

157.    Mr. Sims is entitled to recover attorneys' fees, costs, and pre- and post-judgment interest. *See, e.g.*, NMSA 1978, §§ 39-2-1, 59A-16-30.

### COUNT V. BAD FAITH

158.    All of the forgoing paragraphs are fully incorporated herein.

159.    Insurers and their employees and agents have a duty to deal fairly with their policyholders.

160.    Fair dealing means to act honestly and in good faith in the performance of the contract.  The insurance company must give equal consideration to its own interests and the interests of the policyholder.

161.    An insurance company acts in bad faith when it refuses to pay a claim of the policyholder for reasons which are frivolous or unfounded.

162.    Defendants First American, Dalton, and Hendrickson have blatantly and repeatedly placed their own interests ahead of the interests of Mr. Sims.

163. Defendants First American, Dalton, and Hendrickson have repeatedly failed and refused to properly pay Mr. Sims' claims, as described herein.

164. Defendants First American, Dalton, and Hendrickson's failure and refusal to pay for Mr. Sims' undisputed property and contents damages are particularly alarming, given that the damages undisputedly exist and are covered under the Policy.

165. Defendants First American, Dalton, and Hendrickson's groundless reliance on their "adjusted" inventory in order to limit Mr. Sims' personal property claim, in and of itself, is bad faith.

166. There is absolutely nothing in Defendants First American, Dalton, and Hendrickson's "adjusted" inventory to suggest that Mr. Sims agreed to the figures or is otherwise bound by the figures.

167. Defendants First American, Dalton, and Hendrickson's assertions and representations that Mr. Sims is bound by the "adjusted" inventory figures is not only in bad faith, but also in direct breach of the Policy's terms, which *require* payment based upon reality, not Defendants First American, Dalton, and Hendrickson's arbitrary estimates and figures.

168. Defendants First American, Dalton, and Hendrickson's groundless reliance on their "adjusted" inventory is also in direct contradiction with their own directives to and requirements of Mr. Sims, in which Mr. Sims was required to *repeatedly* submit contents lists, receipts, documentation, and photographs in order to prove the value of the items. Defendants First American, Dalton, and Hendrickson's actions of repeatedly requiring documentation and information from Mr. Sims, only to later ignore that documentation and information in favor of their own arbitrary "adjusted" inventory, were in bad faith.

169.    Mr. Sims has repeatedly and continuously suffered and been damaged as a result of the bad faith behaviors of Defendants First American, Dalton, and Hendrickson.

170.    Mr. Sims is entitled to compensatory damages, treble damages, and punitive damages as a result of Defendants First American, Dalton, and Hendrickson's bad faith actions and omissions, which were in reckless disregard to the interests of the Mr. Sims, were based on a dishonest judgment, and were otherwise malicious, willful and wanton.

## COUNT VI. FRAUD

171.    All of the foregoing paragraphs are fully incorporated herein.

172.    In addition, and in the alternative, Defendants First American, Dalton, and Hendrickson committed fraud against Mr. Sims.

173.    Defendants First American, Dalton, and Hendrickson misrepresented facts to Mr. Sims that they knew to be untrue and made representations that they knew to be reckless when making them, including those misrepresentations and reckless representations further described herein.

174.    Defendants First American, Dalton, and Hendrickson made those misrepresentations and reckless representations further described herein with the intention of deceiving and inducing Mr. Sims to act upon them.

175.    Defendants First American, Dalton, and Hendrickson's misrepresentations and reckless representations were specifically intended to induce Mr. Sims to purchase the Policy; to induce Mr. Sims into paying additional premiums for the "Eagle Premier Coverage" Endorsement; to induce Mr. Sims into limiting his rights and payments under the Policy (including, but not limited to, his rights to replacement cost value of personal property,

additional living expenses, dwelling repair costs, interest, and other Policy benefits); to induce Mr. Sims to refrain from filing an immediate and/or timely lawsuit against them; to induce Mr. Sims into allowing Defendants First American, Dalton, and Hendrickson to continue their delays and stall tactics; and to induce Mr. Sims into accepting the low-ball payments offered by Defendants First American, Dalton, and Hendrickson in hopes that Mr. Sims would not pursue his claims further and would instead allow Defendants First American, Dalton, and Hendrickson to gain further profit by paying out less than what is owed on Mr. Sims' claims.

176.    Mr. Sims relied upon Defendants First American, Dalton, and Hendrickson's misrepresentations and reckless representations to his detriment and has suffered damages as a result, as further described herein.  Those damages include, but are not limited to, the inability to purchase replacement property due to the underpayment of his claims, the inability to repair his Home, damage to his finances, damage to his emotional well-being, damages to his familial relationships, and other damages to be proven at trial.

177.    Defendants First American, Dalton, and Hendrickson are liable for all damages caused as a result of their fraudulent behavior.

178.    Defendants First American, Dalton, and Hendrickson acted in a willful, wanton, fraudulent and malicious manner by engaging in fraud against Mr. Sims' interests, thereby entitling Mr. Sims to punitive damages to punish Defendants and deter others from similar malicious and heedless conduct.

179.    Defendants First American, Dalton, and Hendrickson acted unreasonably in their fraudulent actions with respect to Mr. Sims and his claims.

180.    Mr. Sims is entitled to recover attorneys' fees, costs, and pre- and post-judgment interest.

## COUNT VII. NEGLIGENT MISREPRESENTATION

181.    All of the foregoing paragraphs are fully incorporated herein.

182.    In addition, and in the alternative, Defendants First American, Dalton, and Hendrickson made multiple negligent misrepresentations in Mr. Sims' claims processes.

183.    Defendants First American, Dalton, and Hendrickson made multiple representations that were false and/or misleading over the course of their advertisements and their dealings with Mr. Sims, as further described herein.

184.    Defendants First American, Dalton, and Hendrickson failed to exercise ordinary care in obtaining and/or communicating the representations to Mr. Sims, as further described herein.

185.    Defendants First American, Dalton, and Hendrickson intended that Mr. Sims would receive and be influenced by their false and/or misleading representations, and it was reasonably foreseeable that Mr. Sims would be harmed if that information was conveyed to him and was incorrect and/or misleading, as further described herein.

186.    Defendants First American, Dalton, and Hendrickson's false and/or misleading representations caused harm to Mr. Sims, as further described herein.  Those damages include, but are not limited to, the inability to purchase replacement property due to the underpayment of his claims, the inability to repair his Home, damage to his finances, damage to his emotional well-being, damages to his familial relationships, and other damages to be proven at trial.

187.     Defendants First American, Dalton, and Hendrickson are liable for all damages caused as a result of their negligent misrepresentations.

188.     Defendants First American, Dalton, and Hendrickson acted unreasonably in negligently misrepresenting facts to Mr. Sims.

189.     Mr. Sims is entitled to recover attorneys' fees, costs, and pre- and post-judgment interest.

## COUNT VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

190.     All of the foregoing paragraphs are fully incorporated herein.

191.     Defendants First American, Dalton, and Hendrickson have engaged in socially reprehensible, extreme, reckless, intentional, and outrageous conduct in relation to Mr. Sims' Policy and claims.

192.     Defendants First American, Dalton, and Hendrickson's conduct in relation to Mr. Sims' Policy and claims has risen to the level of being beyond all possible bounds of decency and is utterly intolerable in a civilized community.

193.     Mr. Sims and his family had lived in the Home for only three (3) years when the fire occurred.

194.     At the time of the fire, Mr. Sims and his wife were married and jointly raising their three (3) young children.

195.     Mr. Sims trusted his insurer and its employees and agents to protect, indemnify, and make Mr. Sims whole following the fire; instead, Defendants First American, Dalton, and Hendrickson acted in their own best interests and with total disregard for the effects of their actions on Mr. Sims, his family, his marriage, and his finances.

196. Defendants First American, Dalton, and Hendrickson's intentional, reckless conduct has taken a serious and detrimental toll on Mr. Sims physically, emotionally, financially, and with respect to his familial relationships.

197. The egregious and illegal actions of Defendants First American, Dalton, and Hendrickson caused marital and familial discord and significantly and materially contributed to Mr. Sims' divorce from his wife and loss of time with his children after the fire.

198. Mr. Sims is entitled to recover damages for the emotional harm and loss of consortium caused by the reckless, intentional actions and omissions of Defendants First American, Dalton, and Hendrickson.

199. Defendants First American, Dalton, and Hendrickson acted in a willful, wanton, and malicious manner in intentionally inflicting emotional harm on Mr. Sims, thereby entitling Mr. Sims to punitive damages to punish Defendants and deter others from similar malicious and heedless conduct.

## COUNT IX. DECLARATORY JUDGMENT

200. All of the foregoing paragraphs are fully incorporated herein.

201. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

202. In addition, and in the alternative, the Policy issued by Defendant First American is ambiguous in multiple respects, thus requiring a declaration by the Court that Mr. Sims is

entitled to certain coverages and payments under the Policy that are currently being denied by Defendants First American, Dalton, and Hendrickson.

203.    In addition, and in the alternative, Defendant First American has repeatedly charged Mr. Sims premiums for a Policy that is fraudulent, ambiguous, and illusory.  This is partially the result of the policy as written, and partially the result of the policy as it is being applied by Defendant First American in Mr. Sims' claim.

204.    "Ambiguities arise when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the contract is illogical, or when a particular matter of coverage is not explicitly addressed by the policy." *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 19, 123 N.M. 752, 758, 945 P.2d 970, 976.

205.    "The court's construction of an insurance policy will be guided by the reasonable expectations of the insured.  2*Couch 3d, supra,* § 22:11.  An ambiguity in an insurance contract is usually construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language."  *Id.* ¶ 22.

206.    Mr. Sims has paid hundreds of dollars in extra premiums for the enhanced "Eagle Premier Coverage" Endorsement.  *See, e.g.,* Ex. A, First American 002016 and 002056-002057.

207.    This "*Premier*" coverage is supposed to provide 100% replacement coverage at the time of loss on personal property and additional coverage and limits on nine types of valuable property.  Ex. A, First American 002056-002057.  *See also*, Defendant First American Website, https://www.fapcig.com/products/homeowners/.

208.    Nevertheless, Defendants First American, Dalton, and Hendrickson have consistently refused to provide Mr. Sims with the stated and purchased benefits of this coverage. Instead, they have paid only a miniscule amount of actual cash value for personal property lost or damaged in the fire and have required Mr. Sims to repurchase items to receive replacement cost benefits.  This is a blatant violation of the provisions of the Policy's "Eagle Premier Coverage" Endorsement.

209.    In addition, and in the alternative, the provision found in the "Eagle Premier Coverage" Endorsement's "Section I – Conditions," at Paragraph (C)(3)(b) of the "Loss Settlement" section, is ambiguous and therefore must be construed in Mr. Sims' favor.  *See* Ex. A, First American 002056.

210.    The "Eagle Premier Coverage" Endorsement's "Section I – Conditions," at Paragraph (C)(3)(b) of the "Loss Settlement" section, states, "When the replacement cost for the entire loss under this endorsement is more than $500, we will pay not more than the actual cash value for the loss or damage until the actual repair or replacement is complete."  (Hereinafter the "Amended Loss Settlement Section").  *Id.*

211.    However, this provision in and of itself is illusory, ambiguous, and inconsistent with the remaining language in the Policy, including the "Eagle Premier Coverage" Endorsement.

212.    The Amended Loss Settlement Section is inconsistent with the Section I – Property Coverages Replacement Cost endorsement language found in Paragraph (C)(5) of the "Eagle Premier Coverage" Endorsement, which states in pertinent part, "Covered losses to the following property are settled at replacement cost at the time of loss: a. Coverage C – Personal Property."  *Id.*

213.    The Amended Loss Settlement Section is also inconsistent with the provision immediately before it, which states in pertinent part, "We will pay no more than the least of the following amounts: (1) Replacement cost at the time of loss without deduction for depreciation; (2) The full cost of repair at the time of loss; (3) The limit of liability that applies to Coverage C, if applicable."  *Id.* at "Section I – Conditions," ¶ (C)(3)(a)(1)-(3).

214.    In other words, two sections of the "Eagle Premier Coverage" Endorsement expressly state that personal property will be paid at replacement cost *at the time of loss*, not after it is actually replaced and not only in the event that the "entire loss" (which is itself undefined) is under $500.  *Id.* at First American 002056.  The Amended Loss Settlement Section should be similarly and consistently interpreted and applied and, to the extent that Defendants First American, Dalton, or Hendrickson suggest that replacement cost at the time of loss is only available under limited circumstances (*i.e.*, when the "entire loss" is less than $500), the Amended Loss Settlement Section should be stricken as ambiguous, inconsistent with the remainder of the Policy, and contrary to the reasonable expectations of Mr. Sims.

215.    In addition, and in the alternative, the entire Paragraph that includes the Amended Loss Settlement Section creates a conflict within the Policy itself.  Ex. A, First American 002056.

216.    Endorsements, such as the "Eagle Premier Coverage" Endorsement, provide new policy language that add to or amend the existing language.  *See, e.g.*, Ex. A, First American 002056 ("For an additional premium, the endorsement Enhancement Plus is deleted in its entirety and replaced by the following additions or amendments to your policy as follows: . . .").

217.    Here, the "Eagle Premier Coverage" Endorsement includes Section I – Conditions, Paragraph C "Loss Settlement," which replaces Section I – Conditions, Paragraph C, of the policy form.  Ex. A, First American 002056.

218.    However, in the policy form itself, Section I – Conditions, Paragraph C, is actually the "Duties After Loss" section, not the "Loss Settlement" section.  *Id.* at First American 002039.

219.    Accordingly, applying the "Eagle Premier Coverage" Endorsement's Section I – Conditions, Paragraph C, in place of the policy's Section I – Conditions, Paragraph C, entirely eliminates the "Duties After Loss" section of the policy form and instead creates *two different and conflicting* "Loss Settlement" provisions in the Policy, one of which is the "Eagle Premier Coverage" Endorsement's language (*see* Ex. A, First American 002056, Section I – Conditions, Paragraph C. Loss Settlement) and one of which is the standard policy form's "Loss Settlement" provision language (*see* Ex. A, First American 002039, Section I – Conditions, Paragraph D. Loss Settlement).

220.    There is no way to reconcile these two entirely different Loss Settlement provisions directly.  Rather, an ambiguity is created and the "Eagle Premier Coverage" Endorsement must be found to override the standard policy form's language, particularly in light of Mr. Sims' additional payments for the "Eagle Premier Coverage" Endorsement's "premier" benefits, such as immediate replacement cost benefits.

221.    This again results in defaulting to Section I – Personal Property, Paragraph (C)(5), of Mr. Sims' "Eagle Premier Coverage" Endorsement coverage, which states that he is entitled to replacement cost at the time of loss and mentions nothing about having to actually replace the items in order to be entitled to such benefits.  *See* Ex. A, First American 002056.

222.    This also results in elimination of the "Duties After Loss" section of the policy form, since the "Eagle Premier Coverage" Endorsement's Section I – Conditions, Paragraph C, expressly replaces the policy's Section I – Conditions, Paragraph C ("Duties After Loss").  Ex. A, First American 002039, 002056.

223.    In addition, and in the alternative, Defendant First American sold Mr. Sims an ambiguous, fraudulent, and/or illusory Policy, particularly with respect to the "Eagle Premier Coverage" Endorsement, if the Court ultimately determines that the meaning of the term "entire loss" in the Amended Loss Settlement Section refers to the entire occurrence (*i.e.,* the fire), as opposed to simply the loss of a single item, and if the Court further determines that all damage from the fire must be under $500 in order for Mr. Sims to recover immediate replacement cost under the "Eagle Premier Coverage" Endorsement.

224.    Mr. Sims' deductible is $1,000, meaning that he could *never* reap the benefits of such a provision under such an interpretation, because a payable loss for him will *never* be under $500.  *See* Ex. A, 002016.  This renders the Amended Loss Settlement Section, the Policy, and the entire "Eagle Premier Coverage" Endorsement *per se* illusory by providing no benefit whatsoever, in spite of taking payments for such benefits.

## JURY DEMAND

Mr. Sims hereby demands a twelve-person jury trial on all issues triable by jury, with the exception of Mr. Sims' request for Declaratory Judgment.  Mr. Sims asks that his request for Declaratory Judgment be determined by the Court.

WHEREFORE, Plaintiff Timothy J. Sims prays this Court enter Judgment against Defendants First American, Dalton, and Hendrickson, and for the following relief:

A.      Breach of Contract damages;

B.      UIPA damages;

C.      UPA damages;

D.      Twisting damages;

E.      Bad faith damages;

F.      Fraud damages;

G.      Negligent misrepresentation damages;

H.      Emotional distress damages;

I.      Compensatory damages and penalties for all Counts alleged herein;

J.      Statutory damages and penalties for all Counts alleged herein;

K.      Punitive damages for all Counts alleged herein;

L.      Treble damages for all applicable Counts alleged herein;

M.      Declaratory judgment as described herein;

N.      Costs;

O.      Attorneys' fees;

P.      Pre- and post-judgment interest; and

Q.      Such other and further relief as the Court deems just and proper.

Respectfully Submitted,

O'BRIEN & PADILLA, PC


By: */s/ Erica R. Neff*
    DANIEL J. O'BRIEN
    ERICA R. NEFF
    Attorneys for Plaintiff Timothy J. Sims
    6000 Indian School Rd. N.E., Suite 200
    Albuquerque, NM 87110
    (505) 883-8181
    dobrien@obrienlawoffice.com
    eneff@obrienlawoffice.com